## Case No. 7,930.

### KRAMME et al. v. The NEW ENGLAND.

[1 Newb. 481.] [1]

District Court, E. D. Louisiana. June, 1854.

ADMIRALTY—PLEADING—ALLEGATIONS AND PROOFS.

1. Parties to suits in admiralty must be bound by their allegations and proofs, and the former, to be effectual, must be sustained by the latter.

2. When the allegations of the libel are not sustained by proof, the libel will be dismissed.

[This was a libel by Peter Kramme and others against the master and owners of the ship New England for damages for breach of contract.]

T. J. Durant, for libelants.
E. A. Bradford, for respondents.

McCALEB, District Judge. The libelants are a portion of a large number of German emigrants who arrived in this port in the month of December last, in the ship New England, from Bremer Haven. The voyage commenced about the 31st of October, 1853, and lasted fifty-eight days. The libel alleges that in consideration of the sum of thirty Bremen dollars, being about $23 United States currency paid, the libelants each and their families were to be provided with a steerage passage from Bremer Haven to New Orleans in the ship New England, with not less than fourteen clear superficial feet of the lower deck or platform, for one passenger; and that three quarts of water per day during said voyage should be furnished to each passenger, and that there should be furnished to each passenger per week during said voyage, one-tenth of fifteen pounds of good navy bread, ten pounds of rice, ten pounds of oat meal, ten pounds of wheat flour, ten pounds of peas and beans, thirty-five pounds of potatoes, one pint of vinegar, sixty gallons of fresh water, ten pounds of .salted pork free of bone, all to be of good quality, with liberty to supply and substitute one pound of either of the above articles in lieu of five pounds of potatoes to each passenger, and all cooking to be done by the cook of the vessel and at the vessel's expense. The libel further alleges that shortly after the sailing of the ship. the captain and owners withheld from and refused to furnish to libelants and their families any water whatever, for the space of three

[1] [Reported by John S. Newberry, Esq.]

weeks; during which time over one hundred passengers in the ship died, and afterwards the libelants were put on short allowance of water during the remainder of the voyage; and the captain and owners during the whole voyage violated their entire contract of passage, and failed to furnish the libelants and their families, during the said voyage, with the water and provisions stipulated to be furnished by the agreement, whereby libelants and their families during the voyage suffered great want, hunger, thirst and starvation, to the great injury of the health, and deprivation of the comfort, and danger of the lives of the libelants and their families, for which each of them for himself, and for his wife, and for each of his children, claims five hundred dollars.

The answer of the claimants sets up a general denial of these allegations of the libel, and avers that on or about the 29th of Sept., 1853, Isaac Orr, acting as master of the ship New England, and for and on account of the claimants, entered into a contract of charter party, with F. W. Bodiker, Jr., of Bremen, agent for merchants and freighters, that the said ship New England should proceed to Bremer Haven, and there being properly fitted and prepared for the purpose, should receive on board the full complement of between-deck passengers, which said vessel was allowed to take according to the laws of the United States, and which said merchants and freighters engaged to ship, together with their luggage, the requisite quantity of water, provisions, fuel, &c., according to the American and Bremen laws, and therewith proceed to New Orleans, where the passengers and their luggage were to be delivered, &c. The answer further avers, that the contract was duly fulfilled on the part of the ship New England; that at all times throughout the voyage from Bremer Haven to New Orleans, the passengers on board the ship were duly supplied with provisions and water in pursuance of the contract; or if any change was made, it was made in accordance with the request and suggestions of the passengers on board. The answer specially and earnestly denies that the proper supply of water and provisions was either withheld or refused to the passengers, or that any of the said passengers on board of the New England suffered either want, hunger, thirst or starvation to the injury of their health, the deprivation of their comfort or danger of their lives; and it further avers that in all respects during the voyage, the master of the ship and all the other officers and the crew thereof, labored to alleviate the sufferings of the unfortunate passengers who were attacked by sickness, and to promote the comfort, so far as was in their power, of all on board.

I have attentively examined the evidence adduced on the trial of the cause, and with-

out extending this opinion to an unreasonable length by a minute commentary on that evidence, I shall proceed to give rather the conclusions to which I have been led, than a detail of the particular facts from which those conclusions have been formed. I deem it unnecessary to go into the inquiry how far the master of the New England violated the provisions of the acts of congress in taking on board his vessel a larger number of passengers than those acts prescribe. It is certain that no complaint has been specifically made against him on that ground, and no evidence has been introduced to sustain it. The libelants have not shown that they were unnecessarily crowded, or that a want of room on board was the cause of their alleged sufferings. If the master were on trial for an infringement of the regulations of congress upon this subject; if he were a defendant in a prosecution instituted to enforce a penalty or a forfeiture for a non-compliance with those regulations, it would be proper to inquire how far the legislation of congress as it now exists in reference to the subject, would meet the exigencies of the case. But it is proper that the parties should be held bound by the allegations and proofs, and the former, to be effectual, must be sustained by the latter. The specific allegations in the libel to which the evidence has been directed, and which have been mainly relied on by the proctor of the libelants, are those which relate to a want of provisions and a want of water.

The evidence for the libelants has been positively contradicted by that introduced by the respondents, and it becomes the duty of the court, as it would be the duty of a jury under similar circumstances, to decide upon the credibility of the witnesses. I am satisfied that there was no want of provisions. The stipulations of the charter party seem to have been fully complied with; and if there was any deviation from time to time from the agreement, it took place at the express solicitation of the passengers themselves. If, for instance, a particular article of food was preferred to the one prescribed, the taste of the passengers was consulted and gratified. If all the different articles of food called for by the contract were not at all times the most wholesome for persons suffering as many of these passengers were from the effects of a distressing and fatal disease, it was a misfortune and a contingency which the parties to the contract could not foresee or guard against. Whatever could be reasonably expected under the circumstances seems to have been done by the master and his officers to alleviate the sufferings of the unfortunate beings committed to their care. . In reference to the charge of withholding water from the passengers, the testimony of the libelants (several of whom were examined) and other emigrant passengers, is unequivocally strong and positive; and if it were true, would certainly convict the officers of this vessel of an offense revolting to humanity, and one which would call loudly for the interposition of the criminal laws administered by this court. But much of this evidence is too strong for human belief. The witnesses testify to what, in the nature of things, cannot be true. When they declare that for three weeks after the vessel sailed from Bremer Haven they received no water whatever, their statements assume a character of extravagance and improbability which place them beyond the pale of credibility. Some of them even declared that they received no fluid whatever. Wilhelm Schnitz being asked "if during the first three weeks any fluid was given to the passengers at all," witness answers that "neither tea nor coffee, nor anything was given to them to drink." And yet notwithstanding this privation for so long a time, the witness survived to tell the tale, and both he and his wife arrived safely in this port. But he himself, upon cross-examination, states that he received coffee and tea, but not regularly; he had to do without tea sometimes in the evening. He received them during the first three weeks, but not regularly. The witnesses introduced on the part of the libelants, almost without an exception, declare that the cause of the sickness which prevailed so extensively and so fatally on board this vessel, was the want of water. This is positively contradicted by the fact that some of the passengers were sick when they came on board, and several of them died before they left the river at Bremer Haven, and were carried on shore for interment. That a disease strongly resembling cholera in its symptoms prevailed on board this vessel, there can be no reasonable doubt. That it prevailed to a limited extent in the emigrant houses in Bremer Haven at the time the vessel sailed, there can be as little doubt. This is evident from the fact that the deaths before alluded to, occurred so soon after the emigrants embarked; and from the fact that a similar disease prevailed on other emigrant vessels which left Bremer Haven for this port shortly after the New England.

It is a singular fact in connection with the evidence of the libelants, that notwithstanding the serious charges in the libel against the master of the New England, the witnesses invariably speak of him as one who did them no harm, and many of them detail facts which show him to have been uniformly kind and humane towards the passengers; that he contributed from his private stores to alleviate the sufferings of the sick, and resorted to expedients to induce all to leave as often as possible the close air of the cabin between decks for the pure air of the upper deck. I am satisfied from the evidence, that he was not deficient in proper attentions to his passengers, and that in his offices of humanity he was kindly and active-

ly aided by his wife, who was also on board. The testimony of Mary E. Lysaght, who was the stewardess on board the New England, shows that "when the sickness was prevailing on board, the captain went down between decks very frequently. She knows that he took things down to the sick very often. The sick sent to him for wine and medicines, and he always furnished them. She has seen Mrs. Orr, the captain's wife, go among the sick on deck inquiring about and taking notice of them. She has seen her preparing drinks for them, gruel, wine, sago, which she gave to them, and this every day, almost from the time the sickness began and while it continued. The witness was kept running all the time to wash up the bowls and dishes which she (Mrs. Orr) used for them. Mrs. Orr waited on the sick, and the witness waited on her." This witness also testifies that she went to the ship's galley very frequently. The passengers' galley was right along-side. She went there every day very often. She says that coffee was made for the passengers every morning except one, when it blew so hard that they could not get water, and no fire was on that day lighted in either galley. Tea was made in the passengers' galley every evening, except on the one day spoken of. The carpenter and the boy gave out the water. The witness never heard any complaint from any of the passengers, that they did not get water enough. She never saw anything which made her suppose that they were in want of it. A man called Kunk and one called Nieland and some others, could talk English; others than Kunk and Nieland but little. These always told the witness that the passengers were very well satisfied; that the captain was a very good man to them. The witness declares that she heard the captain ask Kunk particularly if the passengers were satisfied. and he told the captain that they were perfectly satisfied; that they wanted nothing. The evidence of this witness on many material points, is fully corroborated by the first and second stewards and by the officers and seamen of the vessel.

The testimony of the mate shows that the vessel sailed with 424 passengers; that before the vessel left Bremer Haven, four passengers died, and their bodies were taken ashore. He cannot exactly state what was the nature of the sickness, but would judge it was cholera; he thinks so from the fact that the persons attacked, had cramps, and they generally died after a short illness. The sickness continued from fifteen to twenty days; the sick got gradually better as the vessel got into a warmer latitude. Three of the crew died; they had the same kind of sickness, rather harder than the passengers. The witness, the captain and second mate were also sick. The first day when the vessel left the docks, there were two casks full of water lashed alongside the galleys on deck, which gauged 150 gallons each.

The passengers had free access to this water and used as much as they wanted. On the fourth day after sailing, those who had charge of the passengers, Kunk, Nieland and Bruns, who acted as interpreters, came to the captain and in the presence of the first and second mates, and said to him that they had made the voyage across the Atlantic several times, and found that they generally wanted water more in warm weather than in cold, and that they wished that he would give them less water in the cold weather and increase it in warm. They said that the passengers were perfectly satisfied with that arrangement; and they stated at the time that they spoke for all the passengers. In accordance with this arrangement, it appears that the allowance for drinking was reduced to one pint per day for each passenger. The allowance for culinary purposes was, however, not diminished, and it is also satisfactorily shown that whenever a passenger desired water, it was always furnished to him. The short allowance was continued until the 20th of November, when it was increased to three pints, and in the latter part of the voyage they got as much as they wanted. On the arrival of the vessel at this port, sixty casks of water were still left. Applications for water for the sick were made both to the captain and mate, and it was always furnished. The interpreters repeatedly told the captain in the presence of the mate, that the passengers were well satisfied, and that all they wanted was to see land. Much has been said by the witnesses for the libelants concerning the cruelty of the carpenter towards the passengers. They state that he repeatedly inflicted upon them blows. The evidence upon this subject is characterized by the same extravagance and improbability, which pervades that portion which relates more particularly to the want of water. The witnesses seem to me to be exceedingly reckless in their statements, and oftentimes utterly regardless of the solemnity of an oath. They admit the habitual kindness of the captain towards them, and his humanity is too well shown by other witnesses to be seriously questioned. I cannot, therefore, believe that he would have permitted for a moment such acts of cruelty as those complained of. The officers of the vessel and others acting in a subordinate capacity on board of this ship, have shown clearly, that no such acts were committed. The carpenter, acting under the orders of the master, frequently experienced great difficulty and trouble in inducing the passengers to go upon the upper deck on account of their health; and it is shown that in one or two instances a conflict ensued between him and some of the male passengers, who resisted his importunities. But I am led to believe that in these conflicts, which do not appear to have been serious, he suffered much more severely than his antagonists. It is well established by the evidence, that

the passengers entertained a superstitious dread of leaving the cabin and going upon deck. They had an idea and a belief, that all who went upon deck would surely die; and so far was their superstition carried upon this subject, that they refused to assist in consigning the bodies of the dead to the ocean. They resisted for some time the orders of the captain to leave the pent up atmosphere of the cabin, for the fresh air of the deck; and it is somewhat extraordinary that the very measures he resorted to for the preservation of their lives during the prevalence of a malignant disease, should now be alleged against him as acts of cruelty.

With the clear and satisfactory evidence on the part of the respondents, and in the absence of any rational or plausible motive on the part of the master for withholding from the libelants the food and drink with which his vessel was abundantly supplied, I am constrained to say, that the allegations of the libel have not been satisfactorily established by proof; and that there is no ground for a judgment for damages against the respondents or the ship which has been proceeded against in this cause. The libel must therefore be dismissed with costs.